IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARKARA MAN,<br><br>　　　　　*Defendant.* | Case No. 1:18-CR-308<br><br>The Honorable T.S. Ellis, III<br><br>Sentencing Date: December 7, 2018 |

### POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

In the last year, Defendant Markara Man twice faced an important choice and both times chose to act unlawfully. In December 2017, the Defendant, angry about the repeal of net neutrality regulations, chose to act on that anger by sending a disturbing threat to the Chairman of the Federal Communications Commission in hopes it would cause him to reverse his position on net neutrality. Then, in May 2018, confronted with a search by the Federal Bureau of Investigation of his residence, the Defendant wiped data off of a cellular telephone before law enforcement could seized it and then lied about doing so.

In the government's view, the Defendant's repeated criminal conduct warrants a significant sentence. As explained below, a meaningful term of incarceration is necessary not only to account for the seriousness of the Defendant's conduct, but also to account for sentences imposed in similar cases in the Eastern District of Virginia and to send a clear message to the Defendant and the community that such behavior will not be tolerated. The Defendant's position is that his properly calculated U.S. Sentencing Guidelines range is **24 to 30 months**, while the government submits that the Defendant's Guidelines range is **63 to 78 months**. Regardless of the Court's calculation of the Defendant's Guidelines, the government asks that the Court to

impose a term of incarceration within the properly calculated Guidelines and impose a three-year term of supervised release.

## PROCEDURAL BACKGROUND

On June 20, 2018, the Defendant was charged via criminal complaint in connection with a threat he made to kill the children of FCC Chairman Ajit Pai.  As discussed further below, the Defendant made the threat because he was angry about Chairman Pai's vote to repeal certain regulations pertaining to Internet service providers (commonly referred to as "net neutrality") and wanted to scare him into changing his position.  The criminal complaint consisted of one count of 18 U.S.C. §§ 115(a)(1)(A) and 1114, which makes it a federal crime to threaten to murder members of the immediate family of a U.S. government official with the intent to intimidate and interfere with the official while engaged in the performance of official duties and with the intent to retaliate against such official on account of the performance of official duties. (*See* Crim. Compl., Dkt. 1.)

Nine days later, on June 29, 2018, the Defendant was arrested at his residence in Norwalk, California, and thereafter made his initial appearance in the Los Angeles Division of the U.S. District Court for the Central District of California.  The government requested detention, but the Honorable Charles F. Eick, who presided over the initial appearance, denied the government's request.  Nonetheless, U.S. Magistrate Judge Eick stayed bond until July 13, 2018, and imposed various conditions of pretrial release, one of which required the Defendant to submit to a mental health evaluation.  (*See* June 29, 2018 Min. Entry Order, 2:18-MJ-1694 (C.D. Cal.) at 3–4, Dkt. 5.)

On July 13, 2018, Pretrial Services for the Central District of California notified U.S. Magistrate Judge Eick that the Defendant had satisfied the conditions of bond and asked the

Court to order the Defendant's release.  (*See* Pretrial Services' Mem., 2:18-MJ-1694 (C.D. Cal.), Dkt. 14.)  The Court, thereafter, held a status conference on July 19, 2018, at which the Court ordered the Metropolitan Detention Center to conduct a psychiatric/psychological examination of the Defendant and produce a report to the Court and the parties no later than July 27, 2018.  (*See* July 19, 2018 Min. Entry Order, 2:18-MJ-1694 (C.D. Cal.), Dkt. 15.)

The parties returned to court on July 27, 2018, at which time U.S. Magistrate Judge Eick modified the Defendant's appearance bond and ordered him released pursuant to the conditions previously set.  (*See* July 19, 2018 Min. Entry Order, 2:18-MJ-1694 (C.D. Cal.), Dkt. 21.)  The Defendant thereafter remained in California, where he was subject to location monitoring.

On August 31, 2018, the Defendant made his first appearance before this Court for purposes of entering a guilty plea.  The Defendant waived his right to an indictment, and in accordance with a plea agreement, pleaded guilty to a criminal information charging a single count of § 115(a)(1)(A).  (*See* Waiver of Indictment, Dkt. 30; Criminal Information, Dkt. 20; Minute Entry Order, Dkt. 31; Plea Agreement, Dkt. 33.)  The Defendant also stipulated to the conduct described in the Statement of Facts filed in this matter.  (*See* Statement of Facts (SOF), Dkt. 39.)  The Court accepted the Defendant's plea, scheduled sentencing for December 7, 2018, and, over the Defendant's objection, ordered the Defendant detained pending sentencing pursuant to 18 U.S.C. § 3143.  (*See* Minute Entry Order, Dkt. 31; Sealed Order, Dkt. 32.)

## FACTUAL BACKGROUND

The genesis of the Defendant's threatening conduct was the FCC's repeal of net neutrality regulations in December 2017.  Specifically, on December 14, 2017, the FCC Chairman and two other FCC Commissioners voted to repeal net neutrality regulations.  Then, five days later, on December 19, 2017, the Defendant began sending emails from his

3

stubblemanliness@gmail.com account to the FCC Chairman's government and personal email accounts.  (PSR at ¶¶ 16, 21.)

The Defendant's first email to the FCC Chairman was sent on December 19 to the Chairman's government email account.  The subject line of that email was "I agree with you," and the body of the email contained the following text:

> Two kids have killed themselves over net neutrality so far.
>
> Since you're the tiebreaker vote…
>
> *Stares hauntingly past you*
>
> *Slowly raises arm and points directly at you*
>
> Their blood is forever on your hands.

Beneath this email was an image of a Mail Online article with the following headline:  "Boy, 15, kills himself after hearing about the end of Net Neutrality."  An image of the FCC Chairman eating popcorn was superimposed over the image of the article.  (*Id.* ¶¶ 16; 21–22.)

The next day, on December 20, 2017, the Defendant sent two more emails from stubblemanliness@gmail.com to the FCC Chairman.  The first was transmitted at approximately 3:47 p.m. to the FCC Chairman's government and personal email accounts.  The email had the subject line "Cheers" and the body of the email listed the names and addresses of three schools located in or around Arlington, Virginia, followed by this declaration: "I will find your children and I will kill them."[1]  Markedly, the Defendant spent time drafting alternative versions of this email.  One iteration of the email included only the threat to "find" and "kill" the FCC Chairman's children, while another version placed the threat above the list of schools.  Because

---

[1] The FCC Chairman's children did not attend any of the schools that the Defendant listed in his email.  (*Id.* ¶ 23.)

the government is aware of the FCC Chairman only receiving the email timestamped 3:47 p.m., the government believes that these other iterations of the email, which were created between approximately 3:44 and 3:47 p.m., either were never sent or failed to transmit properly. (*Id.* ¶¶ 23, 30.)

The second email that the Defendant sent on December 20, was transmitted at approximately 3:51 p.m. This email, which also was sent to the FCC Chairman's government and personal email addresses, had a blank subject line and no text in the body of the email. Rather than include text in this email, the Defendant embedded an image depicting the FCC Chairman in an interview style setting. Featured in the foreground of the image was a slightly out-of-focus, framed photograph of the FCC Chairman with his wife and minor children. (*Id.* ¶ 24.)

The FBI traced the emails to the Defendant's residence in Norwalk, California, and then, on May 17, 2018, the FBI executed a search warrant at that residence. During the search, the Defendant agreed to a voluntary interview and made a number of admissions, including that he sent the December 20, 2017 email that threatened to kill the FCC Chairman's children from stubblemanliness@gmail.com (an email address he thought made him sound "tougher") and did so because he was angry about the FCC's repeal of net neutrality regulations and wanted to scare the FCC Chairman into changing his position on net neutrality. The Defendant added that he had obtained a "dox," which is Internet slang for personally identifiable information, on the FCC Chairman, admitted that he identified the schools referenced in one of his December 20, 2017 emails by searching on Google Maps, and acknowledged locating a picture of the FCC Chairman's children by conducting a Google search. The Defendant also, at the suggestion of the FBI, wrote an apology letter that read as follows: "Dear Ajit Pai, I'm sorry I made a threat

5

against your kids. That was crossing the line. I hope you'll change your mind on net neutrality but I doubt it. Best Regards, Mark." (*Id.* ¶ 25.)

Although the Defendant readily admitted to threatening the lives of the FCC Chairman's children over the repeal of net neutrality regulations, the Defendant also engaged in obstructive conduct on May 17. At the time of the FBI's search, the Defendant had in his possession a Google Pixel 2 cellular telephone. This device was not the one the Defendant used to transmit his threatening emails, yet the Defendant nonetheless factory reset the device upon realizing the FBI was searching his residence. The upshot of the Defendant's action was that, by the time the FBI secured the device, it was in setup mode and the data on it had been wiped. When asked by FBI agents about the device being in setup mode, the Defendant lied and claimed he had received the phone a month earlier but had not set it up yet. (*Id.* ¶¶ 26, 30.) To date, the FBI has been unable to recover data from the device.

## SENTENCING ANALYSIS

The Defendant's conviction for violating 18 U.S.C. § 115(a)(1)(A) carries a maximum term of imprisonment of 10 years, a fine of $250,000, full restitution, the payment of a special assessment of $100, and a term of supervised release up to three years. (PSR at 1.) The government submits that the PSR has properly calculated the Defendant's Guidelines range at **63 to 78 months**, and a sentence within that range is warranted. The Defendant, conversely, argues that his Guidelines range is **24 to 30 months**, and that a sentence of time served is warranted.

**A.     The PSR's and the Government's Position on the Applicable Guidelines Range**

As set forth in Paragraphs 40 to 45 of the PSR, the Probation Office has calculated the Guidelines range for the Defendant's conviction as follows:

| Guideline | Offense Level |
|---|---|
| The Base Offense Level for the offense is 12 (U.S.S.G. § 2A6.1(a)(1)). | 12 |
| The offense involved any conduct evidencing an intent to carry out the threat (U.S.S.G. § 2A6.1(b)(1)). | +6 |
| Sections 3A1.2(a)(1) and (2) apply, and the applicable guideline for the offense is from Chapter Two, Part A (U.S.S.G. § 3A1.2(b)) | +6 |
| The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, or a closely related offense. (U.S.S.G. § 3C1.1) | +2 |
| **TOTAL** | **26** |

The PSR does not provide for a two or three-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) in light of the application of § 3C1.1.  (*Id.* ¶ 47.)  Based on the defendant's Category I Criminal History, the PSR calculates the Defendant's Guidelines range as 63 to 78 months of imprisonment.  (*Id.* at 19.)  The government agrees with this calculation.

**B.    The Defendant's Objections to the Guidelines**

The Defendant has made two objections to the PSR's calculation of the Guidelines.  One objection is to the application of U.S.S.G. § 2A6.1(b)(1), which provides for a six-level enhancement for conduct evidencing an intent to carry out the threat, and the other is to the PSR's refusal to provide for an acceptance of responsibility reduction.  Neither of these objections are meritorious.

### 1. The PSR Properly Applied § 2A6.1(b)(1)

With respect to the application of § 2A6.1(b)(1), the Defendant suggests that the standard for applying this guideline is clear and convincing evidence and argues that there is insufficient evidence of his intent to carry out the threat to kill the FCC Chairman's children. The Defendant's argument, however, does not accord with the law or the facts of this case.

As an initial matter, the evidentiary standard to be applied here is preponderance of the evidence. Although the Supreme Court's decision in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), included *dicta* suggesting that, in some cases, a sentencing factor that significantly enhances a sentence could require facts to be found by an evidentiary standard greater than a preponderance of the evidence, the Fourth Circuit has repeatedly found that this language was negated by *United States v. Booker*, 543 U.S. 220 (2005). For instance, in *United States v. Grubbs*, 585 F.3d 793 (4th Cir. 2009), the Fourth Circuit considered whether a heightened standard of proof is required where uncharged conduct is used to enhance a defendant's sentence, *id.* at 799. The Fourth Circuit answered this question in the negative, observing that *Booker* and its progeny "nullified" *McMillan*, *id.* at 801, and finding that "[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes," *id.* at 803. Likewise, in *United States v. Chandia*, 675 F.3d 329 (4th Cir. 2012), the Fourth Circuit determined that "preponderance of the evidence is the appropriate standard of proof for establishing the requisite intent for [a] terrorism enhancement," § 3A1.4, even though the enhancement increased the defendant's Guidelines range from 63 to 78 months to 360 months to life, *id.* at 334, 339.

The result of applying the preponderance standard to the Defendant's conduct is that there is sufficient evidence to find that the Defendant had the requisite intent for application of § 2A6.1(b)(1). The commentary that accompanies § 2A6.1 and Fourth Circuit precedent are

instructive in this regard. The Guidelines commentary provides that in determining whether subsection (b)(1) applies, courts are to "consider both conduct that occurred prior to the offense" that was "substantially and directly connected to the offense," as well as "conduct that occurred during the offense." The Fourth Circuit has added that § 2A6.1(b)(1) turns on "'the defendant's intent and the likelihood that the defendant would carry out the threat,'" *United States v. Worrell*, 313 F.3d 867, 876 (4th Cir. 2002) (quoting *United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994)), and that the defendant must have "engage[d] in some form of overt act" beyond the threats themselves, *United States v. Spencer*, 628 F. App'x 867, 869 (4th Cir. 2015) (unpublished).

The Defendant argues that he did not take a meaningful step beyond transmitting a threat and that his lack of a criminal history, mental health, disinclination to leave California, and his lack of firearms ownership show that he did not intend to carry out his threat. This argument, however, minimizes the tone of the Defendant's threat to "find" and "kill" the FCC Chairman's children and the overt acts the Defendant took before and after sending the email containing the threat. *See United States v. Newell*, 309 F.3d 396, 403 (6th Cir. 2002) ("Consideration of the tone of the threats, viewed in conjunction with the defendant's other overt conduct, is proper in determining whether the defendant intended to carry out his threats.").

As outlined above, the Defendant admitted to searching for the addresses of schools in and around Arlington, Virginia, and a picture of the FCC Chairman's children, and he included these items in the emails he transmitted to the FCC Chairman. These acts are significant because they were not necessary to make the threat. Indeed, records recovered from the Defendant's email account indicate that his initial iteration of the threatening email included only the declaration that he would "find" and "kill" the FCC Chairman's children. The fact the

Defendant took the time to search for Arlington area schools and for a picture of the FCC Chairman's children shows that he wanted to know where the FCC Chairman's children were educated and what they looked like. Moreover, his decision to include these items in the emails he sent shows that he wished to convey to the FCC Chairman the seriousness of this threats. In other words, these overt acts provide ample evidence that the Defendant was not making an idle threat but harbored an intent to carry out his threat.

To be sure, this case is unlike the fact patterns in the cases cited in the Defendant's position on sentencing in that the Defendant did not acquire a firearm or make plans to travel to Washington, D.C. area. The absence of such evidence, however, is not an impediment to the application of § 2A6.1(b). This is because the language of the enhancement is broad: the enhancement is warranted when "the offense involved *any* conduct evidencing an intent to carry out [the] threat." § 2A6.1(b) (emphasis added). *Cf. United States v. Ware*, 386 F. App'x 10, at *1 (2d Cir. 2010) (unpublished) (rejecting argument that the absence of evidence that the defendant planned to travel to the location of the victim precluded application of § 2A6.1(b) given that the defendant was found in possession of the types of bullets referenced in his threats, had a history of physically abusing the victim, and sent photographs to the victim depicting him with a gun and a bulletproof vest). Again, the Defendant threatened to "find" and "kill" the FCC Chairman's children, and sent information to the FCC Chairman demonstrating an intent to identify not only the schools at which the FCC Chairman's children attended but also a desire to know what his children looked like. These acts, in short, establish by a preponderance that the Defendant had the intent to carry out his threats and thus warrant application of the enhancement.

### 2. The PSR Correctly Declined to Apply § 3E1.1.

The PSR declines to reduce the Defendant's total Guidelines range for acceptance of responsibility in light of the application of the obstruction adjustment. This is the correct result. As the Fourth Circuit has succinctly explain, "[o]rdinarily, the two-level reduction is not available when the defendant has received an enhancement for obstruction of justice under § 3C1.1 of the Guidelines." *United States v. Harris*, 890 F.3d 480, 488 (4th Cir. 2018). To warrant application of § 3E1.1, the acceptance of responsibility adjustment, the Defendant "has the burden of showing that there are 'extraordinary' circumstances justifying [such] a reduction . . . ." *Id.* The Defendant has failed to meet that burden here.

Although no precise formula exists for determining when a case is "extraordinary" and thus warrants application of both §§ 3C1.1 and 3E1.1, the Fourth Circuit in *Harris* provided some guideposts. *Id.* at 488 (citing *United States v. Honken*, 184 F.3d 961, 969 (8th Cir. 1999), for the proposition that the "totality of the circumstances" are to be considered in determining whether a case is extraordinary). The court explained that, in general, "after having obstructed justice," a defendant "must show that he has done something atypical or beyond the ordinary course either to take responsibility or to minimize the effects of his own obstruction to merit the reduction." *Id.* at 488. The *Harris* court also identified various ways in which a defendant can demonstrate extraordinary acceptance of responsibility, such as by immediately turning himself in after escaping custody, providing an exceptional level of cooperation, or committing limited obstructive conduct and subsequently taking full responsibility for such conduct. *Id.* (citing *United States v. Gregory*, 315 F.3d 637, 641 (6th Cir. 2003), *United States v. Hicks*, 948 F.2d 877, 885 (4th Cir. 1991), and *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994), for each of the preceding examples).

11

The Defendant argues that his case is extraordinary because his obstructive conduct was limited to the destruction of evidence during the search of his residence, he confessed to threatening to kill the FCC Chairman's children, and entered an early guilty plea. None of these facts, however, make this case "atypical." Indeed, in a case involving similar facts, the Fourth Circuit in *United States v. Miller*, 166 F.3d 336 (4th Cir. 1998) (per curiam and unpublished), found that the sentencing court did not err in declining to apply § 3E1.1 to a healthcare fraud defendant who four times told an employee to lie to investigators, *id.* at *2. Like the Defendant, the defendant in *Miller*, upon realizing that his fraud had been exposed, admitted to his underlying criminal scheme, entered a guilty plea, and did not oppose an obstruction enhancement at sentencing. *Id.* at *1. Yet, the district court found (and the Fourth Circuit did not disagree) that this cooperation was not sufficiently atypical to merit application of § 3E1.1. *Id.* at *2.

The Defendant also cites to *Hicks*, 948 F.2d 877, and *Hopper*, 27 F.3d 378, for the proposition that limited obstructive conduct coupled with a guilty plea constitutes an extraordinary case for purposes of the acceptance of responsibility reduction. This principle, however, does not readily follow from these decision. Moreover, both cases are distinguishable in that they involved defendants who either took significant steps to remediate their obstructive conduct or engaged in obstructive conduct that ultimately was ineffective.

In *Hicks*, the district court applied §§ 3C1.1 and 3E1.1 to a defendant who threw cocaine from a car during a police chase but also provided a high level of cooperation following his arrest. 948 F.2d at 880. Specifically, the defendant agreed to show law enforcement the area in which he threw the cocaine from his car, gave law enforcement permission to search his residence, and described for law enforcement the source and intended use of a sum of cash found

at his residence. *Id.* at 879–80.  As the Fourth Circuit recognized on appeal, the defendant's cooperation was to such a degree that it could not say that the district court erred in applying both guidelines.  *Id.* at 885.

The conduct at issue in *Hopper* also concerned the destruction of evidence.  There, the defendant participated in a robbery and then committed several acts of obstruction over the course of about 24 hours, including burning disguises used in the robbery, burning negotiable instruments that he and a co-conspirator had taken during the robbery, hiding robbery proceeds in a storage unit, and attempting to buy a false alibi.  27 F.3d at 381.  The Ninth Circuit found that the district court did not err in applying §§ 3C1.1 and 3E1.1 because the defendant's obstructive conduct "was not a methodical, continued effort to obstruct justice" and thus "not inconsistent with his subsequent acceptance of responsibility."  *Id.* at 383–84.  Although it is not explained in *Hopper* exactly how the government determined all of the obstructive actions taken by the defendant, the subtext of the opinion is that the defendant's obstruction was ineffective.

The Defendant's conduct stands in stark contrast to the obstruction at issue in *Hicks* and *Hopper*.  During the course of the FBI's search of the residence, the Defendant strategically and surreptitiously wiped data from his phone and then lied to the FBI about what he did.  To date, the Defendant has not explained what information was on the phone or advised law enforcement whether the data on the phone may exist somewhere else, such as backed up to a computer or a cloud account, and the FBI has been unable to recover data from the device.  The only cooperative step the Defendant has taken since his obstructive conduct was the entry of an early guilty plea.  But, as reflected in *Miller*, the mere entry of a plea is not enough to warrant application of §§ 3C1.1 and 3E1.1.  In short, this case "is not one of the rare extraordinary cases

13

in which a defendant who has obstructed justice nonetheless earns, by his other positive actions, an adjustment for acceptance of responsibility." *Honken*, 184 F.3d at 973.[2]

## C.     Sentencing Recommendation

As the Court is well aware, it must consult both the Guidelines and the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence for the defendant. Although the Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *Booker*, 543 U.S. 220, 264 (2005). As the Fourth Circuit has explained, district courts are to "first calculate (after making the appropriate findings of fact) the range prescribed by the [G]uidelines. Then, the court shall consider that range as well as other relevant factors set forth in the [G]uidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (citation omitted).[3]

Here, regardless of the Court's Guidelines range calculation, the government submits that a sentence within the applicable Guidelines is supported by several of the § 3553(a) factors, particularly the need for a sentence that reflects the seriousness of the offense, the need for a

---

[2] Should the Court find that § 3E1.1 applies, then this footnote shall serve as notice of the government's motion for a third-point reduction for acceptance of responsibility pursuant to the plea agreement entered into with the Defendant. (*See* Plea Agreement at ¶ 5.)

[3] The § 3553(a) factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other treatment; the kinds of sentences available; the kinds of sentence and the sentencing range established for the type of offense committed; any pertinent policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

14

sentence that avoids unwarranted sentencing disparities, and the need for a sentence that adequately deters the Defendant and others from perpetrating similar crimes.

### 1. The Seriousness of the Offense

The Defendant's conduct is deeply troubling. This is not an individual who engaged in heated political speech or was just blowing off steam. Rather, the Defendant, angry about the repeal of net neutrality regulations, launched a methodical and concerted effort to intimidate and retaliate against the FCC Chairman. The Defendant not only made a direct, unequivocal threat to "find" and "kill" the FCC Chairman's children, but he also took steps designed to show the FCC Chairman that his threats were to be taken seriously.

Promising to kill a federal official's children is not excused by being angry or fearful, as the Defendant suggests in his statement to the Court. It is a threat to be taken seriously, particularly when the threat includes information suggesting that the Defendant is actively trying to identify the whereabouts of the targeted individuals.

### 2. The Need to Avoid Unwarranted Sentencing Disparities

Imposing a significant period of incarceration also comports with sentences imposed in § 115(a)(1) cases within the Eastern District of Virginia. The government's review of PACER indicates that, since 2010, there have been at least four cases in the Eastern District of Virginia in which a defendant pleaded guilty to at least one count of § 115(a)(1). As summarized below, each of these cases resulted in a meaningful period of incarceration:

- In *United States v. Al Snowden, Jr.*, 4:11-CR-63, the defendant pleaded guilty to one count of 18 U.S.C. § 1001 and one count of 18 U.S.C. § 115. The latter charge arose from an in-person threat the defendant made against a Veterans Affairs (VA) special agent while the defendant was at a VA facility. SOF, Dkt. 17. Although the PSR's calculation of the defendant's Guidelines range was 57 to 71

months, the government sought a sentence of 24 to 30 months. Gov't Sentencing Mem., Dkt. 29. The defendant, conversely, asked for a total sentence "substantially less than that recommended by the Guidelines." Def. Sentencing Mem., Dkt. 28. The Honorable Robert G. Doumar **imposed a concurrent sentence of 30 months of incarceration** on each count. Judgment, Dkt. 33.

- In *United States v. Ronald Ruth*, 4:11-CR-94, the defendant pleaded guilty to one count of 18 U.S.C. § 115(a)(1)(B) in connection with his in-person threats to assault Social Security Administration (SSA) authorities at a SSA branch office. SOF, Dkt. 45. It is unclear from the record what the defendant's recommended Guidelines range was, but the government recommended a sentence of 15 months and the defendant sought a sentence of time served. Gov't Sentencing Mem., Dkt. 51; Def. Sentencing Mem., Dkt. 52. The Honorable Henry C. Morgan, Jr. **imposed a term of incarceration of 15 months**. Judgment, Dkt. 54.

- In *United States v. Sonia Chavez Hernandez*, 1:16-CR-142, the defendant pleaded guilty to one count of 18 U.S.C. § 115(a)(1)(A), one count of 18 U.S.C. § 115(a)(1)(B), and one count of 18 U.S.C. § 1513(b)(1). The § 115 convictions concerned a threat the defendant shouted at the direction of an FBI special agent while in a courtroom, as well as threats to harm an Assistant U.S. Attorney and the aforementioned FBI special agent which were conveyed to a confidential human source via a recorded conversation and text message. SOF, Dkt. 29. The PSR calculated the Defendant's Guidelines range as 46 to 57 months, but the government submitted that the Guidelines range should be 15 to 24 months and argued for a sentence of 24 months. Gov't Sentencing Mem., Dkt. 42. The defendant's position on sentencing is unknown because her memorandum was ordered sealed. The Honorable Leonie M. Brinkema **imposed a concurrent sentence of 24 months of incarceration** on each count. Judgment, Dkt. 48.

- In *United States v. William Weaver, II*, 1:17-CR-235, the defendant pleaded guilty to two counts of 18 U.S.C. § 115(a)(1)(B) in connection with threats made online to murder employees of the U.S. State Department and Central Intelligence Agency. SOF, Dkt. 32. The government sought a sentence of 121 months, which was

16

>the high-end of the defendant's Guidelines, in light of the defendant's history of threatening conduct and attempt to obtain a firearm, Gov't Sentencing Mem., Dkt. 41, whereas the defendant requested a sentence of no more than 24 months, Def. Sentencing Mem., Dkt. 40. The Honorable Claude M. Hilton **imposed a concurrent sentence of 57 months imprisonment** on each count. Judgment, Dkt. 43.

The government submits that the upshot of the above cases is that defendants who plead to § 115 offenses in this District routinely are sentenced to terms of imprisonment. In other words, imposing the variant sentence that the Defendant has requested would result in an unwanted sentencing disparity.

### 3. The Need for Specific and General Deterrence

The Defendant's case is part of a growing trend of threats against federal officials. Consider, for instance, recent reports on threats made against Members of Congress. In June 2017, the Sergeant-at-Arms for the U.S. House of Representatives disclosed that House lawmakers had received "902 [threats] in all of 2016" and "950 threats in the *first six months of 2017.*" Nicholas Fandos, *Lawmakers Can Use Campaign Funds for Home Security, F.E.C. Says*, N.Y. Times, July 13, 2017, at A13 (emphasis added), *available at* https://www.nytimes.com/2017/07/13/us/politics/congress-campaign-funds-security-fec.html. Then, in June 2018, the Chief of the U.S. Capitol Police testified before a House Committee that in the "[l]ast year, the number of threat assessment cases that [the U.S. Capitol Police] [have] opened and investigated *nearly doubled.*" *U.S. Capitol Police: Operations and Workforce: Hearing Before the H. Comm. on House Administration*, 115th Cong. 2 (statement of Matthew R. Verderosa, Chief, U.S. Capitol Police) (emphasis added), *available at* https://docs.house.gov/meetings/HA/HA00/

20180626/108480/HHRG-115-HA00-Wstate-VerderosaM-20180626.pdf. These figures are disturbing, particularly since they represent just the threats against congressional members.

Perhaps a reason so many threats are occurring is that offenders do not appreciate the gravity of their conduct. As the Defendant put it, he "wasn't sure if [he] should send the threats but [he] did because of [his] fear and anger." (PSR ¶ 37.) The government submits that had the Defendant understood he would face significant penalties for transmitting the threat, then he would have been less likely to do so.

A significant sentence therefore is necessary not only to deter the Defendant from engaging in such conduct again, but also to deter others. The Internet is rife with disturbing and threatening content, and those communications have real world consequences. Law enforcement must devote resources to investigating such threats and government officials must make public safety decisions often with limited information. *See, e.g.*, Julie Bosman, *Anatomy of a School Lockdown: A Threat, Then the Anxious Wait*, N.Y. Times, Mar. 2, 2018, at A1, *available at* https://www.nytimes.com/2018/03/02/us/threat-school-shooting.html (explaining that school administrators "fac[e] a daily dilemma: Take every possible threat seriously and risk a needless disruption to the school day . . . . [o]r, ignore what could be a real threat and risk the nightmare of your school becoming the next Parkland."). The Court can help deter such behavior by imposing a sentence that makes clear that threatening murder carries serious consequences. And, in so doing, the Court will have protected the community from further harm by this Defendant or others similarly inclined to threaten others.

//

//

//

**CONCLUSION**

For the reasons stated above, the government submits that a sentence within the properly calculated guidelines of **63 to 78 months of imprisonment** is sufficient but not greater than necessary to satisfy the sentencing factors in § 3553(a).  The government also asks that the Court impose a **3-year term of supervised release**.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:         /s/
Alexander P. Berrang
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
Alexander.P.Berrang@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of filing ("NEF") to counsel of record for the defense.

I also certify that on November 30, 2018, I will send a true and correct copy of the foregoing by e-mail to the following:

    Tracey M. White
    Senior U.S. Probation Officer
    Tracey_White@vaep.uscourts.gov

By:        /s/
    Alexander P. Berrang
    Assistant United States Attorney
    U.S. Attorney's Office
    Eastern District of Virginia
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    Tel: (703) 299-3700
    Fax: (703) 299-3981
    Alexander.P.Berrang@usdoj.gov